AO 91
Rev. 11/97

**ORIGINAL**

**CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>TATIANA KHAN | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**10-0030M** |
|---|---|

Complaint for violations of Title 18, United States Code, Sections 1343, 1001 and 1512.

| NAME OF MAGISTRATE JUDGE<br>HONORABLE PATRICK J. WALSH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>October 2006-June 12, 2008; September 18, 2009; and October 2009 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>815 N. La Cienega Boulevard<br>West Hollywood, CA 90069 |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning by at least in or about October 2006, and continuing through at least June 12, 2008, in Los Angeles County, within the Central District of California, and elsewhere, defendant TATIANA KHAN, doing business as Chateau Allegré, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim V.S. and others as to material matters, and to obtain money and property from victim V.S. and others by means of materially false and fraudulent pretenses, representations, and promises and the concealment of material facts, including false representations and material omissions of fact about the origins and values of items that defendant TATIANA KHAN was selling to the victims.  On or about June 12, 2008, within the Central District of California and elsewhere, defendant KHAN, for the purpose of executing the above-described scheme to defraud, willfully caused the transmission, and aided and abetted the transmission of an item by means of wire communication in interstate commerce, namely a $4 million appraisal of a work of art that KHAN falsely represented had been made by Pablo Picasso, which was e-mailed from Dukar Fyfe Insurance, located in Calabasas, California, to the San Diego office of Private Client Group ("PCG"), a division of Chartis, LLC, via Livingston, New Jersey, in violation of 18 U.S.C. § 1343.

On or about September 18, 2009, in Los Angeles County, within the Central District of California, and elsewhere, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically the Federal Bureau of Investigation ("FBI"), defendant TATIANA KHAN knowingly and willfully made a materially false, fictitious and fraudulent statement and representation, in that defendant TATIANA KHAN said to a Special Agent of the FBI that she had obtained the pastel drawing attributed to Pablo Picasso that she subsequently sold to victim V.S. for $2 million from an individual named Rusica Sakic Porter, when, in truth and in fact, as defendant TATIANA KHAN then well knew, she had paid a restorer living in Sherman Oaks $1000 to make the drawing by copying a photograph of a Picasso pastel, in violation of 18 U.S.C. § 1001.

In or about October 2009, TATIANA KHAN intentionally and corruptly endeavored to influence the testimony of a person in an official proceeding, in violation of 18 U.S.C. §1512(b)(1).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>LINDA L. ENGLISH |
|---|---|
| | OFFICIAL TITLE<br>Special Agent - Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE (1) | DATE<br><br>January 7, 2010 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

RAK    REC: (Summons)

## AFFIDAVIT

I, Linda L. English, being duly sworn, hereby depose and say as follows:

### I.

### INTRODUCTION

1.   I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since 1990.  I am currently assigned to the Los Angeles Field Office and to the investigation of financial crimes.  I have been conducting investigations into financial crimes and fraud matters, referred to as white collar crimes, for approximately nineteen years. Since 1991, I have been assigned to conduct investigations involving securities fraud, investment fraud, other financial crimes, and other related offenses.  Because of my training, including at Quantico, Virginia, and experience, I am familiar with federal laws concerning wire fraud, mail fraud, securities fraud, and money laundering, and related offenses including obstruction of justice.

2.   Except where indicated that stated facts are based on information and belief, I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.  This statement of facts is not meant to be a complete recitation of all facts relevant to the criminal conduct described herein, or of all facts known to me

that relate to that conduct.

## II.

### PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of a criminal complaint charging TATIANA KHAN, year of birth 1940, Social Security No. XXX-X8-7799 ("KHAN"), with violations of Title 18, United States Code, Sections 1343 (wire fraud), 1001 (false statement in a matter within the jurisdiction of the executive branch), and 1512 (witness tampering).

## III.

### PROBABLE CAUSE

A.   Summary of Investigation

4.   In or about April, 2009, I was assigned the responsibility of investigating allegations of fraud in connection with the sale by KHAN of certain works of art.  Based on my investigation, as described below, I have determined that KHAN persuaded clients of Chateau Allegré, the antiques and interior design gallery that KHAN owns and operates, to purchase these works of art based on false representations and material omissions of fact about their origins and their values.  For instance, one client paid KHAN $2 million for a pastel drawing based on KHAN's representations that the pastel drawing had been executed by the famous artist Pablo Picasso, had a value of at

2

least $4 million, had previously been sold by the auction house
Sotheby's, and had once been owned by the family of the publisher
Malcolm Forbes.  My investigation revealed that, in fact, KHAN
had paid an artist living in Sherman Oaks $1000 to create a copy
of the pastel by Picasso that had actually been sold by Sotheby's
in 1990, which KHAN then sold as an original Picasso to her
client for $2 million (the copy is referred to hereinafter as the
"Subject Pastel").  KHAN bolstered her false representations that
she handled private sales for the Forbes family and was able to
sell the Subject Pastel for much less than its true value by
falsely telling the client that other paintings she had available
for sale also came from the Forbes family, who -- in order to
keep the sales private -- were willing to sell them for a below-
market value.  KHAN also made false and misleading
representations, including providing fraudulent appraisals to the
victims, for the purpose of lulling the victims into believing
that the items they had purchased were worth at least the prices
they had paid, preventing the victims from seeking information
from outside experts about the items they had purchased, and
commencing and pursuing actions to recover the monies they had
paid to KHAN to purchase the items.

     5.   When interviewed by law enforcement, KHAN made up and
told an elaborate story about how she obtained the Subject

3

Pastel. KHAN also instructed the artist whom she paid $1000 to make the Subject Pastel to tell the FBI that she (the artist) only did restoration work for KHAN and did not do any copy work, and asked the artist to falsify the invoice that she (the artist) had prepared for the copying work.

B.   Details of Investigation

6.   In or about September, 2009, I reviewed documents provided by victim V.S., an individual living in Los Angeles. These documents included the following:

a.   An agreement dated September 23, 2006, and executed by V.S. and J.K., a business associate of V.S., regarding the purchase of *La Femme Au Chapeau Bleu* ["The Woman In The Blue Hat"], a 1902 Picasso," i.e., the Subject Pastel. The agreement provided, among other terms, that: (1) V.S. would pay the $2 million purchase price of the Subject Pastel, i.e., $1,675,000, to Chateau Allegré and $325,000 to J.K. as a return of the deposit J.K. had already paid to Chateau Allegré; (2) V.S. and J.K. would mutually own the Subject Pastel; (3) when the Subject Pastel was sold, the first $2,000,000 plus a cumulative 10% per annum simple interest would be paid to V.S., and then two-thirds of all additional proceeds would be paid to V.S. and the remaining one third would be paid to J.K; and (4) V.S. and J.K. would each obtain insurance coverage for the Subject Pastel.

4

b. A receipt dated October 17, 2006, stating in part the following: "Receipt from Reflections Then and Now & Leslie Kavanaugh Interiors. For: Payment in full for Picasso - Girl in the Blue Hat - c. 1902; Price $2,000,000; Previous Deposit $325,000; Balance Recieved [sic] today $1,675,000." The receipt is written on Chateau Allegré letterhead and is signed "Tatiana Khan."

c. An appraisal dated October 21, 2006. The appraisal states: "Replacement Value of Picasso "La Jeune [] au Chapeau Bleu" ["The Young [] In The Blue Hat"] c. 1902 is $5,000,000." The appraisal is written on Chateau Allegré letterhead and is signed "Tatiana Khan."

d. An appraisal dated June 11, 2008. The appraisal states: "To Whom It May Concern, I am well familiar with and have carefully examined the Painting by Pablo Picasso entitled "La Femme au Chapeau Bleu" painted 1902-1903. . . . I appraise the value of the painting at $4,000,000 (four million dollars)." The appraisal is written on Chateau Allegré letterhead and is signed "Tatiana Khan."

e. A report by Dr. Enrique Mallen, On-Line Picasso Project, dated December 16, 2008, and prepared at the request of V.S. The report compared photographs of the Subject Pastel with photographs of the Picasso pastel that had been sold as lot

5

number 141 at an auction held by Sotheby's in New York on May 17,
1990. Dr. Mallen's report concluded that the Subject Pastel was
not the same work as the pastel auctioned by Sotheby's. Dr.
Mallen further concluded that the Subject Pastel was "not by the
hand of Pablo Picasso." Among other things, the report noted as
"problematic" the fact that the signatures on the Subject Pastel
and the pastel auctioned by Sotheby's are "to all intents and
purposes, identical." Dr. Mallen explained that Picasso's
signatures in the relevant time period "varied considerably . . .
That the two signatures are so similar again works against the
authenticity of the [Subject Pastel]."

7.    I obtained and reviewed records for the Bank of America
account held by TATIANA KHAN, doing business as Chateau Allegré.
These records show the following:

a.    On or about June 27, 2006, two checks from J.K.
and his wife L.K., in the total amount of $325,000, were
deposited into this account.

b.    On or about September 25, 2006, a wire from V.S.
for $50,000 as a deposit on art work was deposited into this
account.

c.    On or about October 3, 2006, a wire from V.S. for
$575,000 as payment for "Le Bouquet sur Le Toit" ["The Rooftop
Bouquet"] by the artist Marc Chagall was deposited into this

account.

d.   On or about October 17, 2006, a check from V.S. in the amount of $1,675,000 was deposited into this account.

8.   On September 18 and 24, 2009, I interviewed KHAN at Chateau Allegré Gallery, on La Cienega Boulevard in Los Angeles. This location is also KHAN's residence.  KHAN voluntarily told me, in substance, the following:

a.   KHAN obtained the Subject Pastel from a woman named Rusica Sakic Porter ["Porter"] in approximately 2005.  Porter did facials in a shop on La Cienega Boulevard across from Chateau Allegré.  KHAN said that Porter had told her that Porter's family purchased the Subject Pastel before the war, which KHAN assumed referred to the Bosnian war.  KHAN believed that Porter had lived in Paris before coming to the United States.  KHAN had known Porter since about 1990 or 1991.  KHAN met Porter when one of KHAN's employees had gone to Porter's shop to have a facial. KHAN said that Porter gave KHAN the Subject Pastel as collateral for a $40,000 loan.

b.   When KHAN obtained the Subject Pastel from Porter in 2005, a piece of paper titled "Record" was paper-clipped to the back of the work.  KHAN identified in her files the original "Record" that she had obtained from Porter.  KHAN noted the paper clip indentation on the top of this document.  KHAN said that she

7

had written the price that Porter's family had paid for the Subject Pastel on the top of the document. KHAN believed the Sakic family had paid about $300,000. KHAN cut this upper portion of the document off before she showed it to J.K.

c. KHAN questioned various people in the industry, for instance at the auction houses Christie's and Sotheby's, as to the value of the Subject Pastel. They told her the work was worth anywhere between $2 million and $5 million.

d. After KHAN took possession of the Subject Pastel, she had it reframed. It was sitting on a chair in her gallery for over a year, until it was purchased by V.S. in October 2006. KHAN decided to lower the price to $2 million because she wanted the money quickly.

e. KHAN had first met V.S. when he was brought to her gallery by J.K. in about September 2006. KHAN also sold V.S. "Le Bouquet sur le Toit" by Marc Chagall.

f. After selling the Subject Pastel to V.S. in October 2006, KHAN told Porter that she would figure out what she owed to Porter. KHAN said that around this time Porter was going home to Bosnia and said that she (Porter) told her (KHAN) that she (Porter) would not be able to take the proceeds into that country, so they would settle up when Porter returned. KHAN said that Porter asked KHAN just to keep paying Porter's bills.

8

Porter returned about two months later and died about one year after that.  KHAN said that their verbal agreement was that she (KHAN) and Porter would share the profit from the sale over the amount that Porter's family had paid for the Subject Pastel. From the amount Porter was to receive, KHAN would deduct the amount she had loaned to Porter, which was about $100,000.

g.   KHAN said that the only items she had ever sold that were connected to Malcolm Forbes were a cabinet and some books with Forbes' stamped signature in them.  KHAN said that she was being sued by her former clients C.B. and J.B., who claimed that KHAN had falsely represented that all of the items KHAN had sold to them came from Malcolm Forbes.  KHAN denied these allegations.

9.   On October 8, 2009, I interviewed Frederick Hudson. Mr. Hudson voluntarily told me, in substance, the following:

a.   He has owned and operated Frederick Hudson Fine Art LLC ("FHFA"), located in New York City, New York, since 1994. FHFA's business model is similar to that of a real estate broker in that FHFA puts buyers and sellers together.  Most of FHFA's clients are art dealers.

b.   He was introduced to KHAN by a friend of his who worked in a consignment store in Los Angeles.  KHAN was an interior designer.

c.   In 2006, KHAN told Hudson that she had buyers who were interested in Impressionist paintings.  KHAN described some of the buyers as investors, who were interested in modern art that they intended to resell.  Hudson later learned that the names of these investors were "Jack" LNU, who was a friend of KHAN's, and his partner "Vic" LNU.

d.   Hudson called everyone he knew to get photographs of available pictures that fit the parameters set out by KHAN and he delivered the photographs and transparencies of the available works to KHAN.

e.   Thereafter, KHAN contacted Hudson and said that her clients who were the investors wanted the painting by Marc Chagall entitled "Le Bouquet Sur le Toit" and an untitled painting by the abstract expressionist artist Willem de Kooning. KHAN sent $25,000 to Hudson on or about September 25, 2006 as a deposit for the Chagall; KHAN sent the final payment of $425,000 a couple of weeks later.

f.   In 2006, it was widely known in the art community that Picasso's "La Femme au Chapeau Bleu," a pastel which had previously been sold at auction by Sotheby's, was on the market for about $1,350,000.  The Picasso pastel was owned by a private collector in Europe who had paid around $900,000 for it.  Hudson included a photo of the Picasso pastel in the batch of

10

photographs that he sent to KHAN.  At the same time as he sent the photographs, Hudson sent printed "provenances" [i.e., ownership histories] of the works.  The provenances were printed on FHFA letterhead.

g.  Hudson identified certain printed provenances, including the provenance for Chagall's "*Le Bouquet Sur le Toit*," as records that had been produced by FHFA.  I compared these printed provenances to the "Record" regarding the Subject Pastel that KHAN said she had received from Porter (see ¶ 8(b), above). I noticed that the "Record" used the same format and typefaces as were used in the FHFA provenances.  I also noticed that the "Record" was printed on a sheet of paper that was the same size as the paper that the FHFA provenances were printed on, except that the portion where the FHFA letterhead would have appeared was cut off on the sheet used for the "Record."

h.  Hudson stated that KHAN had the photographs he sent (as described in ¶ 9(d) and (f)) for a while.  At some point, she told Hudson that he had to get the Picasso pastel for her since she had found a buyer for the work.  KHAN said the only contingency was that she had to have a copy of the certificate of authenticity for the Picasso pastel.  Hudson contacted the dealer representing the owner of the Picasso pastel.  The dealer told Hudson that the owner did not have a copy of this certificate.

11

After Hudson relayed this information to KHAN, their discussions
concerning the purchase of the Picasso pastel ceased.

      i.  Sometime after this, KHAN contacted Hudson and told
him that she had something to tell him that he wouldn't believe.
KHAN said that she had gone to a client's home and had seen the
Picasso pastel that Hudson had been offering to her.  KHAN said
that she would get it for Hudson to see.

      j.  Within a few weeks, KHAN called Hudson and told him
that he needed to come to her gallery to see something.  When he
arrived, KHAN showed him a pastel that appeared to be Picasso's
"*La Femme au Chapeau Bleu*."  KHAN said that she had gotten the
pastel from a lady in Palm Springs who had it in her private
collection.  KHAN said that the woman had inherited a number of
paintings from her wealthy father, who had been a collector in
the 1960s.  KHAN said that the owner had the certificate of
authenticity for the work in her (the owner's) safety deposit
box.  KHAN said that she (KHAN) had traded a large scale European
sculpture that she had been keeping in her back garden for the
pastel.

      k.  Hudson told KHAN that she should contact Sotheby's
due to the similarity of the pastel KHAN was showing him to the
one that Sotheby's had sold in the past.  Hudson said it was
possible Picasso had done two versions, and this could get

written up in an art journal such as ARTNews.  KHAN said that she
didn't want to do this, and asked Hudson not to say anything
about it and to leave the matter alone.

10.  On October 9, 2009, Hudson telephoned me and told me
that he had recalled that, one time when he was at KHAN's
gallery, he met an art restorer there who KHAN introduced to him
as "Maria."  KHAN told Hudson that Maria was a *trompe l'oeil*
["deceive the eye"] artist who did all of KHAN's restoration
work.  Hudson was shown a book with Maria's work in it, and
indicated to me that Maria's work was remarkable.

11.  On November 5, 2009, I interviewed Maria Apelo Cruz.
Ms. Cruz voluntarily told me, in substance, the following:

a.  Cruz is a creative artist and primarily does art
and furniture restoration.

b.  Cruz has known KHAN for approximately eight to ten
years.  Cruz has occasionally done work for KHAN, such as
restoring furniture and paintings.

c.  Cruz said that she made a copy of Picasso's "*La
Femme au Chapeau Bleu*" for KHAN from a photograph provided to her
by KHAN and based on dimensions provided to her by KHAN.

d.  Cruz said that in approximately August 2006, KHAN
came to Cruz's home with a photograph of the Picasso pastel to be
copied.  KHAN explained that the original Picasso pastel belonged

13

to a client of KHAN's.  Apparently, the pastel and several other artworks and pieces of jewelry had been stolen from the client's home.  KHAN told Cruz that she wanted the Picasso pastel copied exactly from the photograph to use as a prop of sorts.  KHAN explained that her client was going to hang the copy in his house to give the appearance that he still had the original, in an effort to catch the thief.

e.  Cruz agreed to copy the Picasso pastel for KHAN. It took Cruz about two weeks to complete the copy.  KHAN wanted a rush on the project.  Cruz charged KHAN $1000 for her work.

f.  Whenever Cruz recreates the work of another artist, she always signs her name followed by "after [the name of the artist]."  In this case, she called KHAN and asked how the copy she was making should be signed, knowing that they were trying to fool the thief into thinking that the KHAN's client still had the original.  KHAN told Cruz to copy Picasso's signature exactly.

g.  About three to four months later, KHAN told Cruz that their idea had worked and that her client had caught the thief, who was the client's son.

h.  Cruz said that, during the week prior to the instant interview, KHAN had called Cruz and asked Cruz to come to KHAN's shop.  KHAN said that she had some items for Cruz to repair.  When Cruz met with KHAN, KHAN told Cruz that she (Cruz)

14

might be contacted by the FBI. KHAN said that it was about the Subject Pastel. KHAN told Cruz to tell the FBI that she (Cruz) hadn't copied any art for KHAN. KHAN told Cruz to tell the FBI that she (Cruz) only restored, not copied, work for KHAN. KHAN also inquired about the billing for the copying project. KHAN had an invoice with her and she wanted Cruz to change the invoice to say that Cruz had retouched a primitive painting. Cruz did not take the invoice and said the request made her uncomfortable. When Cruz asked KHAN about the current location of the copy Cruz had made, KHAN was vague, but mentioned that she (KHAN) no longer had the copy and had given it to a friend.

12. On November 18 and December 10, 2009, I interviewed V.S., who was accompanied by his counsel Mark Beck and Mona Amer of Orrick, Herrington & Sutcliffe LLP. V.S. voluntarily told me, in substance, the following:

a. V.S. has been making investments with, or based on the advice of, J.K. since approximately ten years ago. These investments included works of art purchased from KHAN doing business as Chateau Allegré.

b. J.K. introduced V.S. to KHAN in about July 2006. They met with KHAN at her gallery. KHAN represented that she had art work from the Malcolm Forbes family estate, which she was selling. KHAN said that she was acting as the broker for the

15

Forbes family, since they wanted their paintings sold privately
due to a dispute within the family.  V.S. understood that,
because the Forbes family wanted to keep the sales private, their
artwork was available for prices well below what it was actually
worth.  KHAN showed V.S. a book she possessed which appeared to
be signed by Malcolm Forbes.  V.S. understood that KHAN showed
this book to him as evidence of her relationship with Forbes.

     c.  Based in part on his understanding that the works
of art that KHAN was selling came from the Forbes family
collection and were being sold by KHAN for prices below their
actual value, V.S. attempted to form a syndicate to purchase
these works as investments.  On September 25, 2006, V.S. wired
$50,000 from his account at Bank of America to the bank account
of Chateau Allegré which was used as a deposit on one such work
that KHAN had represented had come from the Forbes family
collection, namely an untitled work by Willem de Kooning.  V.S.
later provided a check for $125,000 to KHAN as a deposit on a
Renoir that KHAN had represented also came from the Forbes family
collection.  V.S. could not find any other investors to
participate in these purchases and subsequently was told that the
de Kooning and Renoir were sold to others.  When V.S. asked for
the return of his deposits, J.K. told him that he would be paid
out of KHAN's commission when the Subject Pastel was sold (see

16

subparagraphs 12(d) and (e), below).

   d.   V.S. believed that J.K. had entered into an
agreement with another person to purchase a pastel by Picasso
entitled "*La Femme au Chapeau Bleu*," (i.e., the Subject Pastel)
which KHAN also claimed to have obtained from the Forbes family
collection.  The other person would purchase the Subject Pastel
and then J.K. and the other person would divide the proceeds in
excess of the purchase price (with one-third going to J.K. and
two-thirds going to the other person) after the Picasso was
resold.

   e.   V.S. further understood that, by September 2006,
J.K.'s deal with the other person had not worked out and J.K.
offered the same deal to V.S.  In reliance on KHAN's
representations that the pastel to be purchased was an authentic
work of art by Picasso, had come from the Forbes family
collection, and was being sold by KHAN for less than its market
value, V.S. ultimately agreed to purchase the Subject Pastel
under the same terms as J.K. had with the other person, except
that insurance and other fees that V.S. would pay would be added
to the cost, and thus returned to V.S. before the remaining
proceeds from the contemplated resale were divided.  The resale
was to be brokered by KHAN.  The return of deposits referenced in
subparagraph 12(c) above, was to come out of KHAN's commission

for this expected sale.

      f.   On October 12 or October 13, 2006, V.S. and J.K. met with KHAN at her gallery.  At that time, V.S. provided KHAN with a check for $1,675,000 for the Subject Pastel.

      g.   Shortly thereafter, V.S. said that he needed an appraisal of the Subject Pastel for insurance purposes.  J.K. said he would obtain the appraisal from KHAN.

      h.   In 2007, V.S. told J.K. that he wanted to sell the Subject Pastel.  On June 1, 2007, J.K. picked up the Subject Pastel from V.S. and delivered it to KHAN.  For seventeen months, J.K. relayed various stories about potential buyers and why the sale was not going through.

      i.   In or about May 2008, V.S. decided to change insurance carriers in order to obtain a better rate.  He told J.K. that he needed a new appraisal of the Subject Pastel and the Chagall that he had purchased from KHAN.  J.K. said he would obtain the needed appraisals from KHAN.

      j.   In or about November 2008, V.S. told J.K. that he wanted the Subject Pastel returned to him.  J.K. agreed to pick up the Subject Pastel from KHAN and deliver it to V.S., which J.K. did.

    13.  On November 20, 2009, I showed the Subject Pastel (which V.S. had provided to me) to Cruz.  Cruz immediately

recognized the Subject Pastel as the one she had drawn for KHAN, as described in paragraph 11, above.

14. On December 22, 2009, I interviewed J.K., who was accompanied by his counsel Paul J. Loh of Willenken, Wilson, Loh, & Lieb, LLP. Among other things, J.K. voluntarily told me, in substance, the following:

a.   V.S. told J.K. that V.S. was getting a new insurance policy and needed a new appraisal of the Subject Pastel.

b.   On or about June 11, 2008, J.K. asked KHAN to provide an appraisal of the Subject Pastel for insurance purposes. In response to this request, KHAN provided J.K. with a handwritten appraisal, dated June 11, 2008, of the Subject Pastel. In this handwritten appraisal, KHAN stated "I appraise the value of the [Subject Pastel] at $4,000,000 (Four Million Dollars)."

c.   On June 12, 2008, J.K., on behalf of V.S., faxed the appraisal that KHAN had given to him to use for insurance purposes to V.S.'s insurance broker Brad Walorinta.

15.   On December 8, 2009, I spoke to Brad Walorinta. Mr. Walorinta is employed by Dukar Fyfe Insurance, located in Calabasas, California, which is the insurance broker used by V.S. Mr. Walorinta provided documents regarding V.S. insurance

19

policies, including a policy issued by AIG.  On December 21 and 23, 2009, I obtained documents relevant to this policy from AIG. These documents showed the following:

a.  On June 12, 2008, Walorinta e-mailed the appraisal that had been handwritten by KHAN on June 11, 2008, for the Subject Pastel to Daniel Munger at his San Diego office for Private Client Group ("PCG"), a division of Chartis, LLC, which is owned by AIG, for the purpose of increasing the insurance value of the Subject Pastel to $4 million.

16.  On December 21, 2009, and January 6, 2010, I spoke to Kimberlie Pezzuto.  Ms. Pezzuto voluntarily told me, in substance, the following:

a.  Pezzuto is currently employed as Assistant General Counsel in the Legal Department of PCG. She has been employed by AIG entities for approximately ten years.  Based on her training for and responsibilities in connection with this employment, Pezzuto knows how e-mails sent to and from AIG and its related entities, including e-mails sent to and from the PCG division, are routed.

b.  Since at least June 2008, all e-mails sent to and from AIG, including e-mails sent to and from PCG, are routed through the AIG Data Center/Server, which is located in Livingston, New Jersey.

17.   On September 15, 2009, I spoke with L.G. in Beverly Hills.  L.G. voluntarily told me, in substance, the following:

a.   Several years ago, L.G. began purchasing collectibles and other decorative items from KHAN, through her gallery Chateau Allegré.

b.   Most of the items that L.G. purchased from KHAN were from the Malcolm Forbes estate.  KHAN represented that most of what she sold was obtained through a London dealer, who sold items from the Forbes collection.

18.   On November 10, 2009, I spoke with C.L., who voluntarily told me, in substance, the following:

a.   About three years ago, C.L. bought four items from KHAN.  C.L. paid a total of approximately $4000 for the four items.

b.   KHAN told C.L. that she was giving him a great deal on the items because she had to clear out her shop to make room for the entire Forbes collection, which she had purchased.

19.   On December 15, 2009, I spoke to Ronald D'Alessandro. Mr. D'Alessandro voluntarily told me, in substance, the following:

a.   From January 1, 1990, until his retirement in April 2009, D'Alessandro was the Director of Security for the Forbes family and all related entities.

21

b. A check of the records of the Forbes Curatorial Department by its director Bonnie Kirchstein showed that no work by Pablo Picasso has ever been owned by Forbes.

c. The Forbes Curatorial Department, the Forbes Foundation, and individual Forbes family members have no knowledge of an individual by the name of TATIANA KHAN or of Chateau Allegré. The Forbes family, corporations and its entities have never had any agreements, written or implied, with KHAN or Chateau Allegré. No item from the Forbes collection has ever been sold to KHAN or Chateau Allegré by any member of the Forbes family or any Forbes entity.

IV

CONCLUSION

20. Based on the facts and information presented above, I believe that there is probable cause to believe that:

a. On June 12, 2008, TATIANA KHAN caused an interstate wiring in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 1343;

b. On September 18, 2009, TATIANA KHAN made a false statement in a matter within the jurisdiction of the executive branch, in violation of 18 U.S.C. § 1001; and

c. In or about October 2009, TATIANA KHAN intentionally and corruptly endeavored to influence the testimony

22

of a person in an official proceeding, in violation of 18 U.S.C.

§1512(b)(1).

LINDA L. ENGLISH
Special Agent, FBI

Sworn and subscribed to
before me on this ___ day
of January, 2010.

23